IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WESTFIELD INSURANCE COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 19-cv-00794 |
| v. ) | |
| ) | Judge Andrea R. Wood |
| ZAREMBA BUILDERS II LLC, et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

This case concerns an insurance coverage dispute over whether Plaintiff Westfield Insurance Company ("Westfield") has a duty to defend or indemnify Defendants Zaremba Builders II LLC, Kevin Zaremba, and Zaremba Commercial Construction, LLC (collectively, "Zaremba") in connection with a lawsuit filed by Defendant Vrdolyak Trust and 139th Street Holdings ("Vrdolyak Trust"). As alleged in the complaint in that lawsuit ("Vrdolyak Complaint"), Zaremba contracted to build a house for the Vrdolyak Trust but did a poor job, resulting in serious structural and aesthetic issues for which the underlying lawsuit asserts various claims for damages. Westfield insures Zaremba. In response to the Vrdolyak suit, Westfield has filed the present declaratory judgment action seeking a declaration that it owes no duty to defend or indemnify Zaremba with respect to the claims asserted there. Before the Court is Westfield's motion for summary judgment. (Dkt. No. 71.) Zaremba, joined by the Vrdolyak Trust, opposes the motion. For the reasons given below, the Westfield's motion is granted.

### BACKGROUND

On June 14, 2018, the Vrdolyak Trust filed suit against Zaremba in the Circuit Court of Cook County, Illinois alleging various claims relating to the construction of a home by Zaremba

for the Vrdolyak Trust. (Def.'s Resp. to Pl.'s Statement of Mat. Facts ("DRSMF"), ¶¶ 5–38, Dkt. No. 77.) In February 2019, Westfield filed the present action seeking a declaratory judgment that it owed Zaremba neither a duty to defend nor a duty to indemnify it in connection with the suit. Subsequently, the Vrdolyak Trust twice amended the complaint pending in state court. (DRSMF. ¶¶ 39, 42.) Each time, Westfield filed an amended complaint in this related action. (Am. Compl., Dkt. No. 36; Second Am. Compl., Dkt. No. 56.) For purposes of the present motion, the allegations contained in the Vrdolyak Trust's Second Amended Complaint ("Vrdolyak Complaint") control.[1] The material facts are undisputed.

## I. The Underlying Suit

In 2015, Zaremba and the Vrdolyak Trust entered into a contract wherein Zaremba agreed to construct a house for a total of $1,650,102. (DRSMF ¶ 46.) Under the terms of the contract, Zaremba agreed to supervise the construction of a single-family residence at the listed address and provide the labor, materials, tools, and all other costs necessary to finish the project. (Pl.'s Statement of Mat. Facts ("PSMF"), Ex. G at 1, Dkt. No. 73-7.) Additionally, the contract required Zaremba to perform the work in a "workmanlike manner and in strict accordance" with its terms and included a warranty as to the materials used and work performed. (PSMF, Ex. G at 1, 4–5, Dkt. No. 73-7.) Zaremba also agreed to Specifications that, among other things, required Zaremba to provide labor and material for the entire home. (PSMF, Ex. H, Dkt. No. 73-8.) Of particular relevance here, the Specifications explicitly stated that Zaremba was responsible for providing and installing "Appliances" and "Cabinets." (PSMF ¶ 75, Ex. H at 8–9, Dkt. No. 73-8.) Moreover, the Contract stated that the Vrdolyak Trust could send Zaremba a "punch list" of outstanding items

---

[1] The Vrodlyak Second Amended Complaint refers to Zaremba Builders, LLC, Zaremba Commercial Construction LLC, and Kevin Zaremba as, collectively, the "Zaremba Defendants" and alleges that Kevin Zaremba owns all the LLCs and uses them interchangeably. (DRSMF ¶¶ 43–44.)

and that Zaremba would be required to complete the tasks within thirty days. (PSMF, Ex. G at 1, Dkt. No. 73-7.)

According to the Vrdolyak Trust, the total listed in the contract was already between $200,000 and $300,000 more than the price Zaremba initially quoted. (DRSMF ¶¶ 8, 46.) In fact, the Vrdolyak Trust alleges that it ultimately paid approximately $500,000 to $600,000 over the initial quote of $1,300,000 for the project. (*Id.* ¶ 49.) The Vrdolyak Complaint lists various reasons for the cost overages, ranging from charges for electrical work that was never completed to failure to recover funds from a subcontractor who walked off the job to increased mortgage interest resulting from construction delays. (*Id.* ¶¶ 47, 49–50.)

Additionally, the Vrdolyak Complaint sets forth an account of numerous problems with the project. (*Id.* ¶¶ 47–55; Defs.' Statement of Add. Mat. Facts ("DSAMF"), ¶ 2, Dkt. No. 79.) Some of the claims relate to various breaches of contract, such as Zaremba's alleged purchase of doors that cost $6,000 less than those called for by the contract, failure to install an elevator, shower doors, and a mirror as specifically required by the contract, and installation of hardwood floors in the incorrect color. (DRSMF ¶¶ 49, 52.) Others relate to the construction of the house; for example, the Vrdolyak Complaint alleges the existence of painting defects, including bubbling and peeling, which caused damage to the woodwork. (*Id.* ¶ 51.) Similarly, the Vrdolyak Complaint alleges that a subcontractor improperly installed a rubber membrane in the master shower, damaging both the bathroom tiles and kitchen ceiling and leading to mold, the presence of which prevented Nancy Vrdolyak from using the master bathroom until February 2018 and which still prevents the use of the master shower. (*Id.* ¶ 53.)

Certain of the alleged issues are particularly relevant for purposes of determining the scope of Westfield's coverage. For instance, Zaremba allegedly left the basement full of water for

months, causing damage to ductwork, framing, and piping in the home. (*Id.* ¶ 48.) The presence of standing water also apparently led to a mold issue for which the Vrdolyak Trust demanded that Zaremba hire an expert to remediate. (*Id.*) However, according to the Vrdolyak Trust, Zaremba attempted to remediate the mold itself using chlorine, resulting in further damage to the basement. (*Id.*) Additionally, the Vrdolyak Trust claims that the house's occupants, who moved into the house in April 2017, suffered significant congestion, difficulty breathing, and allergies resulting from the mold. (DSAMF ¶ 2-A, E, I.) The Vrdolyak Complaint also details an incident in which a pipe that should not have been active burst in the three seasons room of the home, damaging the framing, flooring, trim work, and painting. (DRSMF ¶ 54.) The floor of the room was further damaged by painting tape that was not timely removed. (DSAMF ¶ 2-H.)

Finally, the Vrdolyak Trust asserts that Zaremba damaged tangible property other than the house itself. Specifically, the Vrdolyak Trust alleges that a clothes dryer and kitchen cabinets were damaged—the clothes dryer was allegedly dented in early 2017 as it was moved, while the kitchen cabinets were damaged when the sink was put in place at the end of 2016. (PSMF, Ex. F at 2–3, Dkt. No. 73-6.) The Vrdolyak Trust acknowledges that no other tangible property was damaged, aside from the damage to the structure that is the subject of the current state court litigation. (*Id.*)

Based on these allegations, the Vrdolyak Complaint asserts seven counts against Zaremba, including claims for breach of contract, breach of fiduciary duties, fraud in the inducement, breach of warranty, breach of the implied warranty of habitability, and breach of promissory note.[2]

---

[2] Count VII of the Vrodlyak Complaint alleges that Kevin Zaremba and Zaremba Builders defaulted on a valid promissory note entered with the Vrodlyak Trust in July 2015. (DRSMF ¶ 61.)

4

## II. The Policy

Westfield issued Policy No. CWP 3 510 692 ("Policy") with Zaremba Commercial Construction LLC as the named insured[3] for an initial effective period of December 6, 2014 to December 6, 2015. (DRSMF ¶ 62.) The Policy has been renewed annually and remains in effect. (*Id.*) It includes a provision for Commercial General Liability ("CGL") coverage. The Insuring Agreement of Coverage A of the CGL provides that Westfield "will pay those sums that the insured becomes legally obligated to pay as damages because of 'property damage' to which this insurance applies." (DRSMF ¶ 66.) Although the Policy states that Westfield will have the "duty to defend the insured against any 'suit' seeking those damages," it also provides that Westfield will have "no duty to defend the insured against any 'suit' seeking damages for 'property damage' to which this insurance does not apply." (*Id.*) According to the Policy terms, Coverage A "applies to . . . 'property damage' only if . . . the . . . 'property damage' is caused by an 'occurrence.'" (*Id.*)

Section V of the Policy defines the relevant terms:

> 13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.
>
> 16. "Products-completed operations hazard":
>
>> a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:
>>
>>> (1) Products that are still in your physical possession: or
>>>
>>> (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

---

[3] For purposes of the pending motion, Westfield accepts that the three Zaremba Defendants each qualify as an insured. (DRSMF ¶ 63.)

> (a) When all of the work called for in your contract has been completed.
>
> . . .
>
> (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project. Work that may need service, maintenance, correction, repair, or replacement, but which is otherwise complete, will be treated as completed.

> 17. "Property damage" means
>
>> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>>
>> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(DRSMF ¶ 70; DSAMF ¶ 4.)

Coverage A is also subject to several exclusions, including ones for "Expected or Intended Injury," "Contractual Liability," and "Damage to Your Product." (DRSMF ¶ 67.) Finally, the CGL includes a "Fungi or Bacteria Exclusion" endorsement, which provides that the insurance does not apply to "'bodily injury' or 'property damage' which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation, ingestion of, contact with, exposure to, existence of, or presence of any 'fungi' or bacteria on or within a building or structure . . ." (*Id.* ¶ 71.) Fungi is further defined as "any type or form of fungus, including mold or mildew." (*Id.*)

## DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment, the nonmoving party's evidence "is to be believed,

and all justifiable inferences are to be drawn in [its] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "The moving party is entitled to a judgment as a matter of law [where] the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

This Court exercises its diversity jurisdiction over this case. *See* 28 U.S.C. § 1332.[4] "Questions of insurance-policy interpretation are substantive," *Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 723 (7th Cir. 2015), and "[a] federal court sitting in diversity jurisdiction must apply the substantive law of the state in which it sits." *Land v. Yamaha Corp.*, 272 F.3d 514, 516 (7th Cir. 2001). The parties here agree that Illinois law controls the construction and application of the Policy's terms.

"Under Illinois law, the construction of an insurance policy is a question of law." *Sokol & Co. v. Atl. Mut. Ins. Co.*, 430 F.3d 417, 420 (7th Cir. 2005) (citing *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1212 (Ill. 1992)). An insurance policy is a contract governed by the same general rules that govern the interpretation of other types of contract. *Westfield Ins. Co. v. Vandenberg*, 796 F.3d 773, 777 (7th Cir. 2015) (quoting *Hobbs v. Hartford Ins. Co. of the Midwest*, 823 N.E.2d 561, 564 (Ill. 2005)). Thus, the Court's primary objective should be to enforce the intentions of the parties as expressed by the language of the agreement. *Id.* To accomplish that end, courts should consider the "policy as a whole," which requires "taking into account the type of insurance for which the parties have contracted, the risks undertaken and

---

[4] Westfield is incorporated and has its principal place of business in Ohio. Zaremba Builders II is a limited liability company formed under the laws of Illinois whose members are all citizens of Illinois. Zaremba Commercial Construction is a dissolved limited liability company formed under the laws of Illinois whose members were all citizens of Illinois. Kevin Zaremba is a citizen of Illinois. And finally, Nancy Eileen Vrodlyak, the Trustee of the Vrodlyak Trust, is a citizen of Illinois.

7

purchased, the subject matter that is insured and the purposes the entire contract." *Id.* (quoting *Crum & Forster Managers Corp. v. Resol. Tr. Corp.*, 620 N.E.2d 1073, 1078 (Ill. 1993)).

Courts must look to the factual allegations of the underlying complaint to determine whether an insurer has a duty to defend. *Amerisure Mut. Ins. Co. v. Microplastics, Inc.*, 622 F.3d 806, 810 (7th Cir. 2010). Only "[i]f the facts alleged in the underlying complaint fall within, or potentially within, the policy's coverage, [does] the insurer's duty to defend arise." *United Fire & Cas. Co. v. Prate Roofing & Installations, LLC*, 7 F.4th 573, 580 (7th Cir. 2021) (quoting *Outboard Marine*, 607 N.E.2d at 1212). Courts place "little weight" on the "legal label under which a count is brought." *Lexington Ins. Co. v. Chi. Flameproof & Wood Spec. Corp.*, 950 F.3d 976, 980 (7th Cir. 2020) (quoting *Ill. Cas. Co. v. W. Dundee China Palace Rest., Inc.*, 49 N.E.3d 420, 426 (Ill. App. Ct. 2015)). Instead, courts look to the conduct alleged to determine whether there is a duty to defend. *Id*. "Both the policy terms and the allegations in the underlying complaint are liberally construed in favor of the insured, and any doubts and ambiguities are resolved against the insurer." *Amerisure Mut. Ins.*, 622 F.3d at 811 (quoting *State Farm Fire & Cas. Co. v. Perez*, 899 N.E.2d 1231, 1235 (Ill. App. Ct. 2008)). Finally, because an insurer's duty to indemnify is narrower than its duty to defend, if an insurer owes no duty to defend, it will owe no duty to indemnify. *Nationwide Ins. Co. v. Cent. Laborer's Pension Fund*, 704 F.3d 522, 528 (7th Cir. 2013) (citing *Crum*, 620 N.E.2d at 1081).

### I. Property Damage

The Policy is a CGL policy. And it is well-established that CGL policies "are intended to protect the insured from liability for injury or damage to the persons or property of others; they are not intended to pay the costs associated with repairing or replacing the insured's defective work and products, which are purely economic losses." *Lagestee-Mulder, Inc. v. Consol. Ins. Co.*,

682 F.3d 1054, 1057 (7th Cir. 2012) (quoting *Travelers Ins. Co. v. Eljer Mfg., Inc.*, 757 N.E.2d 481, 503 (Ill. 2001)). As courts have consistently noted, if courts were to find that CGL policies cover "simple economic loss stemming from a contractor's breach of contractual obligations," including the contractual obligation to perform the work in accordance with certain standards, "the contractor would be paid initially by the property owner to perform the (shoddy) work and then would get paid by the insurance company to repair or replace that (shoddy) work product, in essence an unfair and inappropriate double recovery—and a reward for poor performance." *Certain Underwriters at Lloyd's London v. Met. Builders, Inc.*, 158 N.E.3d 1084, 1091 (Ill. App. Ct. 2019) (collecting cases).

Under the terms of the Policy, Westfield is only required to pay those sums that Zaremba is legally obligated to pay as damages because of "property damage" caused by an "occurrence." The Policy defines "occurrence" as an "accident, including repeated exposure to the same conditions." Although "accident' is not defined in the Policy, Illinois law defines the term to mean "an unforeseen occurrence, usually of an untoward or disastrous character or an undesigned, sudden, or unexpected event of an inflictive or unfortunate character." *Certain Underwriters at Lloyd's London*, 148 N.E.3d at 1092 (internal quotation marks omitted). Yet courts are wary of transforming CGL policies "into something akin to a performance bond." *Eljer Mfg.*, 757 N.E.2d at 503 (internal quotation marks omitted). Therefore, "courts have determined that damage to a construction project that occurs as a result of a construction defect, does not constitute an 'accident' or 'occurrence' because it is the natural and ordinary consequence of faulty construction." *Westfield Ins. Co. v. Nat'l Decorating Servs., Inc.*, 863 F.3d 690, 697 (7th Cir. 2017) (internal quotation marks omitted). Nonetheless, when policies define "occurrence" to

9

include "repeated exposure to the same conditions," "negligently performed work or defective work can give rise to an occurrence." *Id.*

However, any "occurrence" must also give rise to "property damage" to fall under the purview of the CGL policy. The Policy defines "property damage" as "physical injury to tangible property" and "loss of use of tangible property that is not physically injured." But when the alleged damage occurred in the course of a construction project, "tangible property" must be property ***outside the scope*** of the contracted-for project. *See Lagestee-Mulder*, 682 F.3d at 1057 ("Where the underlying suit alleges damage to the construction project ***itself*** because of a construction defect, there is no coverage. By contrast, where the complaint alleges that a construction defect damaged something ***other*** than the project, coverage exists."). In other words, courts have "repeatedly recognized that while a CGL policy will not insure a contractor for the cost of correcting construction defects, damage to something other than the project itself ***does*** constitute an 'occurrence'" warranting coverage." *Acuity Ins. Co. v. 950 W. Huron Condo. Ass'n.*, 138 N.E.3d 189, 196 (Ill. App. Ct. 2019) (internal quotation marks omitted).

Here, the scope of Zaremba's construction project encompassed the entire home. And the Vrdolyak Complaint alleges only damage to the structure itself—that is, damage that falls within the scope of Zaremba's contract. For instance, the Vrdolyak Complaint alleges significant damage to the three seasons room due to Zaremba's failure to turn off a pipe in the winter (causing it to burst and flood the room) and negligence in leaving painting tape on the floor (damaging the concrete). Similarly, the Vrdolyak Complaint claims that Zaremba left the basement full of water for months and failed to seal floors properly, leading to damaged ductwork, framing, and piping, and a mold issue that Zaremba failed to properly remediate. Other alleged damage includes water

10

damage and mold preventing use of the master bathroom, improperly pitched garage floors and incorrectly sized bedroom closets, painting defects, and the wrong color hardwood floors.

Critically, all this alleged damage constitutes damage to the very house Zaremba was contracted to build; as such, it does not qualify as "property damage" under the terms of the Policy. *See Stoneridge Dev. Co., Inc. v. Essex Ins. Co.*, 888 N.E.2d 633, 654 (Ill. App. Ct. 2008) (finding that there was no "property damage," and therefore no coverage, where the underlying complaint only alleged damage to the foundation of a home built by the insured and that an action to recover the costs to repair the home and its diminished value sought only "economic losses"). This conclusion remains true regardless of whether the Vrdolyak Complaint contains any allegations that could constitute an "occurrence," without considering which property was damaged. Westfield contends that there can be no coverage because the Vrdolyak Complaint only contains allegations of poor workmanship, which cannot constitute an "occurrence." In contrast, Zaremba maintains that the Vrdolyak Complaint alleges negligent conduct, not faulty workmanship, qualifying as an "occurrence" under the Policy. Yet an "occurrence" alone does not trigger coverage; there must also be "property damage." And it is well-established that, in cases involving defective construction, damage to parts of the project resulting from poor workmanship does not cause "property damage" but economic loss. *Viking Constr. Mgmt. v. Liberty Mut. Ins. Co.*, 831 N.E.2d 1, 17–19 (Ill. App. Ct. 2005) (holding that a complaint sought recovery for economic loss, not property damage, when a masonry wall collapsed as a result of the insured builder's negligent failure to properly brace the wall and reiterating that the cost to repair or replace a contractor's defective work is not "property damage" so as to trigger coverage).

Even the cases cited by Zaremba reinforce the principle that only damage to property outside the scope of a construction project can trigger coverage under a CGL policy. For instance,

11

Zaremba relies on *National Decorating* to support its contention that the duty to defend is triggered when the underlying complaint alleges negligent conduct by the insured. However, in *National Decorating*, the Seventh Circuit relies on a finding that the scope of the project was limited to the named insured's work as a subcontractor, rather than the construction of the entire building. *Nat'l Decorating*, 863 F.3d at 697. In fact, the Seventh Circuit distinguishes between cases where the alleged damage fell under the scope of the insured's project (resulting in no coverage) and those where the insured's work damaged property outside that scope (resulting in coverage). *Id.* at 697–98. And while the Seventh Circuit finds the scope of the project in *National Decorating* more limited, it nonetheless notes that "had [the insured] contracted to construct an entirely new building, any damage or defects in that building, ***which would be defined as the property or work product of [the insured]***, would not be covered under the policy." *Id.* at 698 (quoting *Ohio Cas. Ins. Co. v. Bazzi Constr. Co.*, 815 F.2d 1146, 1148 (7th Cir. 1987)). Thus, while *National Decorating* may stand for the proposition that negligent conduct may trigger coverage, it nonetheless still requires that negligent conduct result in property damage where such damage is defined by the scope of the project. But here, the insured (Zaremba) was contracted to build the entire building. *National Decorating* is therefore inapposite.

Zaremba's reliance upon *Pekin Insurance Co. v. Marker Associates, Inc.*, 682 N.E.2d 362 (Ill. App. Ct. 1997), is similarly misplaced. According to Zaremba, *Pekin* stands for the proposition that CGL policies cover faulty workmanship that causes an accident, which they allege occurred here. Again, however, Zaremba focuses solely on the question of whether the "accident" triggered an "occurrence" and neglects to consider the accompanying requirement of "property damage." In *Pekin*, the complaint alleged that faulty workmanship led to a burst pipe, causing significant damage to "carpeting, drywall, antique furniture, clothing, personal

12

memontoes [sic], and pictures." *Pekin Ins.*, 682 N.E.2d at 363. After emphasizing that there is only potential coverage when there is "damage to property **other than the insured's own work or product**," the court notes that the alleged damage to the furniture was "more than an allegation that the building itself was defective." *Id*. at 365–66. But the Vrdolyak Complaint alleges no damage to anything outside the construction project itself. True, much like in *Pekin*, the Vrdolyak Complaint alleges that a pipe burst and caused damage. Unlike in *Pekin*, however, such damage was limited to the framing, flooring, trim work, and painting of the three seasons room—all of which fell under the scope of the project.

Zaremba attempts to find coverage by claiming that the Vrdolyak Trust does, in fact, assert property damage to tangible property other than the house—specifically, dents in a clothes dryer and damage to kitchen cabinets—thus meeting the requirement for "property damage."[5] In other words, the clothes dryer and kitchen cabinets are equivalent to the damaged furniture in *Pekin*. Contrary to Zaremba's position, however, both the clothes dryer and the cabinets were part of the project and thus cannot qualify as damage to "other property" so as to trigger coverage.

That the clothes dryer was included in the scope of the project is supported by numerous documents in the record. For instance, the Specifications includes "Appliances" as part of the project. A clothes dryer, of course, is an appliance. Zaremba suggests that only those appliances explicitly listed under "Appliances" should be considered as part of the project. Yet the list of appliances in the Specification is not meant to be inclusive of any and all appliances Zaremba must purchase as part of the project. Instead, the listed appliances are only those for which labor is

---

[5] Although neither the damage to the clothes dryer nor the damage to the kitchen cabinets is mentioned in the Vrodlyak Complaint, when determining the existence of a duty to defend, the Court may look to evidence beyond that contained in the underlying complaint so long as doing so does not determine a critical issue in the underlying suit. *Pekin Ins. Co. v. Wilson*, 930 N.E.2d 1011, 1020 (Ill. 2010).

already included in the contract price.[6] Moreover, a clothes dryer is undoubtedly part of the contemplated scope of a contract to build a house with a laundry room.[7] And finally, the Vrdolyak Trust included the dented dryer on its "punch list" of items that it believed Zaremba was contractually required to repair (DRSMF ¶ 77; PSMF, Ex. I at 6, Dkt. No. 73-9.)

Similarly, both common sense and the record confirms that the kitchen cabinets fell within the scope of the project. Kitchen cabinets are undoubtedly included in a contract to build a house with a kitchen; indeed, in the "Cabinets" section of the Specification, "Kitchen Cabinets" are expressly listed. (DRSMF ¶ 75; PSMF, Ex. H at 9, Dkt. No. 73-8.) And again, the damage to the cabinets was recorded in the "punch list" as a repair Zaremba was contractually required to make. (PSMF, Ex. I at 5, Dkt. No. 73-9.) Indeed, Zaremba only summarily argues that kitchen cabinets are not included in a contract to build a house, including a kitchen, devoting only one line in its briefing to the issue. Therefore, based on the undisputed evidence, it is clear that both the clothes dryer and kitchen cabinets fall under the scope of the project Zaremba was contracted to carry out.

---

[6] The Specification states, in part:

> **Appliances**:
>
> **Total Appliance Allowance of $30,000.00**
>
> If Homeowner exceeds the allowance provided, Homeowner will pay Appliance Vendor directly the overage. The overage will be paid at the time the appliances are ordered.
>
> ***Labor included installing*** Built-In Refrigerator, Built-in Gas Cooktop, Built-in Double Oven, Built-In Dishwasher, Microwave, and Warming Drawer & Kitchen Garbage Disposal. Appliances will be purchased from lowest bid Vendor.

(PSMF, Ex. H at 8, Dkt. No. 73-8 (emphasis added).)

Here, the plain language is clear that the named appliances are those for which labor is already included, not that *only* those appliances listed are covered by the appliance allowance.

[7] The Court also notes that other sections of the Specification explicitly reference projects for a "Laundry Room" while the "Plumbing" section includes "gas piping for dryers" as part of its requirements. (PSMF, Ex. H at 9, 12, Dkt. No. 73-8.)

In sum, the Vrdolyak Complaint fails to allege damage outside the scope of the work for which Zaremba contracted. Because coverage under the Policy requires "property damage," and damage to the project itself does not fall under the definition of "property damage," the Vrdolyak Complaint fails to allege damage "potentially within the coverage provisions of the policy" and thus does not trigger Westfield's duty to defend. *Lyons v. State Farm Fire & Cas. Co.*, 811 N.E.2d 718, 721 (Ill. App. Ct. 2004).

## II. Products-Completed Operations Coverage

Zaremba also contends that the underlying claims are covered under its additional Products-Completed Operations coverage. Specifically, Zaremba claims that the burst pipe and health problems caused by mold occurred after the house was "put to its intended use"—that is, after it was occupied. That the house required repairs is irrelevant, as the Policy defines work as being completed when it is put to its intended use even if corrective work is needed. But the purchase of Products-Completed Operations coverage does not mean that, once the project is complete, any damage ***to the project*** itself is covered. While the Products-Completed Operations provision extends the grant of coverage in the insuring agreement to completed products or operations, it remains bounded by the terms of that grant of coverage. And here, the insuring agreement requires that an "occurrence" result in "property damage" to trigger coverage. As discussed above, there can be no "property damage" when the underlying complaint alleges only construction defects causing damage within the scope of the contracted-for project. *See CMK Dev. Corp. v. W. Bend Mut. Ins. Co.*, 917 N.E.2d 1155, 1166 (Ill. App. Ct. 2009) (rejecting the argument that damage to bathroom fixtures that occurred after sale created damage in the property of others so as to trigger coverage because those fixtures were "part of the structure the developer promised to deliver").

The Products-Completed Operations coverage does extend coverage; it just does not extend coverage such as to include the losses at issue here. For instance, had the bursting of the water pipe both occurred after the house was occupied and allegedly damaged personal items (such as furniture or other personal property), the coverage might apply; indeed, the coverage is meant to undo the common exclusion of such situations. *See, e.g., Nautilus Ins. Co. v. Bd. of Dirs. of Regal Lofts Condo. Ass'n*, 764 F.3d 726, 733–35 (7th Cir. 2014) (finding that water damage to residents' personal property fell within a policy's products-completed operations hazard exclusion because, by moving in, the residents had put the property to the intended use). In other words, such coverage is meant to indemnify against the "possibility that the goods, products, or work of the insured, once relinquished or completed, will cause bodily injury or damage to property ***other than to the product or completed work itself,*** and for which the insured may be found liable." *St. Katherine Ins. Co. v. Ins. Co. of N. Am.*, 11 F.3d 707, 711 (7th Cir. 1993) (emphasis added) (quoting *Diamond State Ins. Co. v. Chester-Jensen Co.*, 611 N.E.2d 1083, 1091 (Ill. 1993)). Because the Vrdolyak Complaint alleges only damage to the completed work itself—that is, the house—there is no potential coverage and thus no duty to defend.

### III. Bodily Injury

Lastly, Zaremba contends that the Vrdolyak Complaint alleges bodily injury caused by Zaremba's negligence. Count VI of the Vrdolyak Complaint seeks damages for Zaremba's failure to remediate water damage and the resulting mold and mildew damage throughout the home that rendered the house uninhabitable. Specifically, the Vrdolyak Complaint alleges that "Vrdolyak and her family suffered significant congestion and trouble breathing and allergies due to the air quality in the home," and that "these health issues resulted from mold caused by the standing

water" in the basement. (DSAMF ¶ 2-E, Ex. 1, Second Am. Compl. ¶ 65.) Beyond those respiratory symptoms, the Vrdolyak Complaint contains no other allegations of bodily injury.

Because the only bodily injuries alleged in the Vrdolyak Complaint were directly caused by the presence of mold, a fungus, the "Fungi or Bacteria Exclusion" contained within the Policy bars coverage. This exclusion states that "this insurance does not apply to" any "bodily injury . . . which would not have occurred, in whole or in part, but for the actual, alleged, or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any 'fungi' or bacteria on or within a building or structure." (DRMSF ¶ 71.) According to the Vrdolyak Complaint, the alleged respiratory ailments the occupants of the home suffered were all the result of the presence of mold. Thus, because the alleged bodily injuries fall squarely within the Fungi or Bacteria Exclusion and outside the bounds of coverage, their inclusion in the Vrdolyak Complaint cannot trigger the duty to defend.[8] *See, e.g., Tower Ins. Co. of N.Y. v. Pima Lansing, LLC*, No. 14-cv-02271, 2015 WL 3777405, at *2 (N.D. Ill. Jun. 16, 2015).

## IV. Remaining Arguments

Zaremba has failed to respond to Westfield's remaining arguments against coverage for the claims in the Vrdolyak Complaint, likely because such arguments are well-founded. Outside of the allegations of damage to the house, the remaining allegations in the Vrodylak Complaint all consist of claims for pure economic injuries that are not covered under a CGL policy. *See State Farm Fire & Cas. Co. v. Tillerson*, 777 N.E.2d 986, 992 (Ill. App. Ct. 2002) ("Coverage under contractor general liability policies is for tort liability for damage to other property, not for the insured's contractual liability for economic loss.") And allegations that Zaremba ultimately

---

[8] Because the Fungi or Bacteria Exclusion bars coverage, the Court declines to address Westfield's argument that the underlying complaint cannot contain claims for bodily injury because the plaintiff in that litigation, the Vrodlyak Trust, is not a living person.

charged over $600,000 more to complete the project and took almost twice the time to complete it, resulting in the loss of a favorable rate lock with the Vrdolyak Trust's lender, are quintessential examples of pure economic loss. Additionally, claims for breach of promissory note (essentially, breach of contract) and breach of fiduciary duty are not claims caused by an "accident" so as to constitute an "occurrence." *See, e.g., Johnson v. State Farm Fire & Cas. Co.*, 806 N.E.2d 223, 227 (Ill. App. Ct. 2004) (noting that allegations that executors breached their fiduciary duties by misappropriating funds may constitute an "unfortunate event," such misdeeds are not "accidental" so as to trigger coverage). And because the Court finds that the Vrdolyak Complaint does not allege an "occurrence" that resulted in "property damage" such that the duty to defend is triggered, it need not address whether the Policy's exclusions preclude coverage for the claims. Finally, Zaremba does not contest that Coverage B, which provides insurance for "personal and advertising injury" is not applicable here.

## CONCLUSION

For the reasons discussed above, the Vrdolyak Complaint fails to allege any facts that may potentially result in coverage under the Policy. Accordingly, Westfield has no duty to defend or to indemnity, and its motion for summary judgment (Dkt. No. 71) is granted.

ENTERED:

Dated: March 2, 2022

Andrea R. Wood
United States District Judge